Good morning, Your Honors. May it please the Court. My name is Anna Benvenue, and I'm appearing on behalf of Petitioner Anna Maria Stetco. Today the Court is reviewing an adverse credibility decision in a post-Real ID Act case in which respondent contends this Court has no jurisdiction over the petition. Can we start with this? The briefs in this case are a total mismatch, as you can see. The you're briefing the issue that the BIA decided, and the government is saying that issue doesn't matter at all, doesn't even brief it at all, and says that it's irrelevant because of an alternative holding. So what is your response to that? My response to that, Your Honor, is that the Board of Immigration Appeals only addressed the adverse credibility finding. That was the finding of the immigration judge. That's what was appealed to the Board of Immigration Appeals, and that's what the Board of Immigration Appeals decided here. And that that's what's before this Court for review today. Well, assuming – I understand that, and I understand you had a footnote in your brief where you noted that the – which way the credibility determination comes out turns out to influence the alternative holding, so you couldn't actually have the alternative holding without the credibility determination. But the government hasn't even briefed your issue. So what do we do with that? Well, Your Honor, I think that you find jurisdiction over this petition, find that the adverse credibility finding is not – is not upheld by substantial evidence, not supported by the record, and you remand for the Board to make a decision in the first instance on whether or not Ms. Statko established past persecution, assuming that she did in fact suffer a rape. Even though – so in other words, we reach the issue rather than saying the government waived it and – I mean, they have – ordinarily, in ordinary litigation, if they didn't argue something at all, they'd waive it. I don't know if the government can waive something like that. Arguments on the credibility finding? Yeah. They didn't argue at all. They have nothing in their briefs. Well, that was their choice, Your Honor. Right. And in fact, the credibility finding in this case is incredibly weak. The immigration judge didn't at all consider any of the case law regarding why an – an initial omission of a rape by a rape victim might be reasonable if the rape victim explains that she was – didn't want to talk about it, was trying to avoid it, was trying to leave it in the past, was uncomfortable in the initial circumstances. As Ms. Statko explained here, she was new to this country. She had no family here to support her. She didn't know her lawyer. She didn't want to talk about it. She had never wanted to talk about it. Didn't the immigration judge go through a fairly involved analysis in saying that he could buy all of that – I think he says explicitly something like I could accept that explanation if it wasn't for the fact that she reported the rape to the police, that she reported it to her parents, that she told her friends both in Romania and in the United States. So the – so the judge seemed to put his decision with respect to her credibility and the delay in a much broader context of – of explaining or telling about the incident to many other people. So didn't he address it? He kind of addressed it, but he also misstated the facts and he missed the second part of her explanation, which was it was really hard for me to talk about in And I eventually told my sister and I eventually told my parents. They forced me to go to the police. I didn't want to do that. I had a really negative experience with the police. The police didn't do anything. But the fact that he – the fact that he doesn't mention every single one of the excuses for changing her testimony doesn't mean that it wasn't in front of him. He didn't think about it. I don't know that we have any cases that you must take up every single jot and tittle of what the person says. The fact is he did have you for it. Then when she was asked by the asylum – at the asylum interview, what's the worst thing that happened, she didn't mention it then either. And the – And she said, oh, I've got a reason for it. Well, fine, she has a reason. But we are under the Real ID Act and she's got a reason. That's fine. But who says he has to accept that reason? Well, he doesn't, but he needs to provide a reasoned explanation for why he rejected it. He's provided a reasoned explanation. He said that you – you did this, this, and this. I just don't believe, in light of all the facts in front of me, I don't believe it. He has to understand. She says, well, I have a reason for it. Fine. Does he also have to say, I don't believe your reason? Well, he needs to explain why he's rejecting her reason. Well, he did explain it, but the question – I mean, you're basically questioning his explanation. But the question is – I just have some factual questions about it. When he said that she told everybody or she told her friends, I mean, is there – we know she told her sister, who talked to her, to tell her parents, and her parents sort of insisted she go to the police. Here she doesn't have – her sister is here. Is that right? No, Your Honor. Neither her sister nor her parents are here. Correct. She told her girlfriend in Romania. Is there any evidence that she told anybody here before she voided up in the asylum proceedings? No, there isn't, Your Honor. And also in this Court's case in Moussa. Is that right? In other words, she told at least one person here, but there's no evidence that she told it to them before she decided to bring it up in the asylum proceedings. She told her one friend, Stella, who is her, like, only Romanian friend here. But we don't know that she told her before she brought it up here. It's not clear when she told her, but she did tell her before telling her own attorney. Before doing what? Before she told her attorney and then went to court and told the judge. She told her one friend, Stella, here. And she explained that she didn't have the support of her family and friends here, which is what made it so difficult, and that she didn't know anyone here. She didn't know her lawyer. She didn't know the asylum officer. And she hadn't been assisted by the government in Romania, and she was discouraged by that and depressed by that and felt like there was no point in talking about it. And that explanation was not at all addressed by the immigration judge. He didn't explore the broader explanation. He didn't explain why it's unreasonable. And, frankly, it's quite reasonable, given this Court's precedent. So essentially, what this comes down to, assuming we reach this issue, is that we do have some precedents directly on the question of changes of stories having to do with sexual assaults. Maybe they're a little bit different because he or she did tell some people. But the other question, which I think was briefly alluded to before, is there something about the REAL ID Act that makes those precedents less applicable? Well, the REAL ID Act wasn't in place for those three precedents. But the REAL ID Act doesn't change the core issue here, which is where there's an inconsistency, there needs to be a reasoned explanation for any explanation of that inconsistency. And then whether that rejection is proper can be evaluated by this Court still under the REAL ID Act. That doesn't change. Now, the discussion in the precedent wasn't about whether it went to the heart of the claim or whether it was insignificant enough. It was just simply saying an initial failure to disclose. Now, in addition, the BIA said a couple other things that just don't appear to be supported by the record at all, including that there was no detail and something else. No detail and lack of corroborating evidence. That appears to me to be kind of boilerplate-type language from the BIA. It's not clear at all where the BIA got that otherwise because there is no reference to specificity, lack of specificity or detail. Well, does that make any difference to our review in the sense that maybe if they didn't think that, they would have come out otherwise and that's just clearly wrong? I mean, do we review the fact that they made – if part of their opinion is just wrong, then what do we do? I think that in this case, the opinion is simply just not supported by this record on adverse credibility. I know, but I'm asking you a different question. I'm asking you, suppose we thought, well, maybe it would be okay with regard to the issue of her not having brought up the rape, but then BIA said these – A said these other things, too, which are clearly wrong. What do we do about that? Well, you say that those findings are not supported by the record because there's no issue about specificity and detail. Right. But does that mean that we send it back to the BIA even if we thought that the other thing standing alone might work or not? I think that you can make a finding in this case reversing credibility based on the reasoning provided in the Board's decision. They clearly considered it and it's before this Court. I'd like to reserve that.  Thank you, Rick. I want to come back to this issue of the delay in the reporting. You seem to argue in your briefs that delay cannot be considered, but I'm not sure that's what the Paramasi – I don't know how to pronounce it – that case says. And it struck me that the judge here did consider the delay but considered it in a much broader context of all these other factors, which I mentioned in my earlier question. Do you take the position that the case law prohibits the judge from considering delay in a broader context, or may he consider it? No. He can consider it. He just needs to consider all the factors. And he chose to consider the convenient factors he liked. And the judge was openly hostile to Mestecco. He said to her, in fact, you didn't disclose the rape at the asylum office because it didn't happen. Isn't that true, Mestecco? I mean, he took the position of a hostile cross-examiner. And that kind of environment indicates and that kind of questioning indicates his bias against Mestecco in this case. I'd like to reserve the rest of my time for rebuttal. Thank you. Good morning. May it please the Court. I'm Lyle Gensler. I represent the Respondent, the Attorney General. Your Honor, in answer to your question, we do not believe that the government can waive an argument. There's no prejudice to the Petitioner. Of course there's a prejudice. There's the same prejudice there always is. I mean, I either – excuse me. Yes, Your Honor. Either that or you're saying that the government's just – there's no reason to file Brees at all because the agency can speak for itself. I mean, you do write Brees. And if you don't argue an issue at all, why can't we assume that you don't think it's defensible, so you're not defending it? You can, Your Honor, but that's not the issue. It's waiver, not exhaustion. Of course, it was mentioned in footnote 4 where they talked about the Real ID Act. At any rate – What was waived? I'm sorry. What was waived? The exhaustion? No, no. We believe they waived the exhaustion, yes. Well, I don't understand that. Look, the law is that whether or not change circumstance – whether or not you can have a well-founded fear of persecution without past – depends on whether there was past persecution. Because if there was past persecution, the burden's one way. If there was not past persecution, the burden's another way. It appears that the – what happened here was not exactly an alternative ruling. It was a cumulative ruling. In other words, the immigration judge said, I don't believe her that there was past persecution, and I don't think that she had, because of changed circumstances, any fear of future persecution. But he never shifted the burden. And therefore, the question of whether or not there was past persecution remains a predecessor question to the other one. So I don't understand why she waived. Well, no. When I was talking about waiver, I was talking about our argument to the Court. But we believe she didn't brief it. Very simply, she didn't brief it to this Court. Therefore, it's waived. As to what happened at the BIA, we believe it's exhausted. However, Your Honor, we believe that our brief – we would like to rest on brief on the jurisdictional issue because we believe that the credibility issue is more before the Court now. That's what the Court seems more interested in. And as a result, we would like to rest on brief on that. But why don't we take your brief, which does not argue at all about the credibility issue, as essentially conceding it? Why do we do that? Why do you get to be a special character in this Court who gets to not brief something and nonetheless have us consider it? You would have to look at footnote 4, where it was talked about in the REAL-ID Act, where we talked about she was lying on cases in support of her credibility claim that were overcome by the REAL-ID Act. We know that's thin, but we believe that's enough to preserve this issue. At any rate, this Court has always held that waiver before this Court is prudential. And what we're saying is that there's no harm, no prejudice to the Petitioner case, because she's all right. No, I did not, Your Honor. All right. Go ahead. Thank you. Well, as I was saying, we would prefer to rest on brief on the exhaustion argument and the waiver argument, because we believe it's adequately covered in the brief. Well, I mean, I asked one question about this. You say that the exhaustion requirement is adequately covered. I looked at the BIA holding. The BIA holding says absolutely nothing about the changed circumstances. And the reason for that, Your Honor, is because it wasn't raised. Yes, but if it didn't matter, they wouldn't have written an opinion about something that didn't matter, because it does matter. So doesn't that mean that the only thing that was appealed was the credibility finding? The only thing that was appealed was the credibility finding. That's it. So that's the only thing that's before us, isn't it? We believe that. I'm not quite sure I understand. What you're saying is that if a district court, for example, makes two bases, independent bases for a decision and a person only appeals one of them, the person might very well be mooted because the second issue decides the case separately. But isn't that a problem when you're talking about administrative law? What's happening here is, let's say she only did take credibility to the BIA. I don't know. I'm not going to. Let's just say that. The fact of the matter is all the BIA decided was a question of credibility. So that's all that's in front of us. Now, if the BIA wants to establish a rule that it is therefore moot because on the basis of credibility, the BIA has to decide whether the person is moot or not. That's all that's in front of us, it seems to me. Our job as a reviewing administrative record is to decide the question that was before us. Isn't that right? We agree with that, Your Honor. So it's not moot. I mean, I think you made a mootness argument. It's not exactly moot, is it, before us? Well, the case is not moot. No, the case is not moot. And all I can say is we will rest on brief on that. But we believe credibility is before this Court. It would be helpful to me, though, before you rest on the brief, to hear a comment about the my understanding of this, which is that it cannot – the credibility finding was essential and logically prior to the IJ's second holding. There are not really alternatives, because if you were right the first time, if you were wrong the first time, he would have had to do the second one with a switched burden, which he didn't do. So therefore, the – by appealing the credibility finding, they were over-appealing the whole case, because you would have to reverse the IJ's second holding if you believed that he was wrong on the credibility finding. We believe that when the IJ said, assuming she's credible, even if she is, therefore, we would still find, we believe that covers that, Your Honor. The thing is, though, the IJ's credibility finding is – is supported by substantial record evidence. One thing we would like to point out before we move on, although the record is not clear about a lot of things, it is very clear that in regard to one of the questions that Ms. Ditko did tell her friend Stella, the American friend, prior to going before the asylum officer. You will find that in Record 89-90. Kagan. Okay. That's helpful. But that is clear that she did tell her that. Now, the three cases that Petitioner cites to this Court were never cited to the BIA and were, in fact, never cited to the IJ the first time she came in. Well, that certainly is not a criteria. I mean, I don't know. But it is difficult to understand how they can complain that the BIA and the IJ didn't consider those cases, which, in fact, they considered basically the findings, but not by name. Is this an exhaustion argument, or what is it? No. We're saying that it's kind of contrary. They're wrong. They're wrong. If they're right, they're right. If it's not an exhaustion argument, then it doesn't matter. The point is, Your Honor, that the IJ's credibility finding is supported by substantial evidence. He didn't just give one reason. He gave, I have, nine reasons. The first one, of course, was that she filed a declaration and supporting letters. They were all undated, but she filed them and gave an interview to the asylum officer, and none of these mentioned the rape. Her translator, her interpreter at the meeting, at the meeting with the asylum officer was Stella, her friend who she had previously told about the rape. And Stella knew when the asylum officer asked her, is this the very worst thing that's happened to you? And she said, the very worst thing that's happened is that two professors discriminated against me. I had to take a test twice. And I was blamed for bringing alcohol to a party. Stella knew that wasn't accurate, but never came forward. That's two. When asked, when the immigration judge and the trial counsel asked Ms. Stetko, why did you not reveal this? Why did your family not say anything before? In their declarations, her answers were essentially all over the place and nonresponsive. When she submitted the new declarations on July 28th. Kagan. Isn't the more likely overall explanation that she didn't know that this would be relevant to an asylum because it wasn't done by the government? That may be more likely, but that's pure speculation. That's not what she answered the government. She was represented by the same counsel that she is represented by here. And interestingly, it was only after the asylum officer found that her evidence wasn't sufficient and referred the case to an immigration court that now the rate came out. Next. The letters that. It's all one, though. I mean, basically you have one reason. You're listing the matters as nine, but it's essentially one. It's not one reason. One is that she was inconsistent. Okay. And that's pretty much Passamani and the other cases. Right. But two, it went beyond that. She submitted letters, corroborating letters, all of which failed to mention the rate. Right. When she reversed her story and brought forth new letters, none of those new letters said anything about why. Well, yes, but they did say that she was embarrassed and they were being secret about it and so on. They did say that. No, no, Your Honor. Please read the letters. They said that not in the context of why they didn't raise it the first time, but they did say it. But it all goes to credibility. It does all go to credibility. It's just the whole ball of wax that the judge considered. Well, sure. But what we're trying to say is this isn't simply she didn't say rape originally, therefore she's inconsistent, therefore we find against her. Can I ask you one other question? I know you want to rest on your briefs on this alternate holding, but I've got to ask you one thing that's struck me. Yes, Your Honor. And maybe I'm wrong about this, but when the judge only briefly mentions changed conditions on page 11 of the I.J.'s decision, it's kind of, I'm not sure if it's a fully alternate holding or not, but isn't it true that the changed conditions and the things that he talks about occurred before the rape, the alleged rape? So if that's true, how can it demonstrate changed conditions? Not the gay rights movement. The – and before I answer, Your Honor, with your permission, since I'm out of time. Yes, go ahead. I understand that. The gay rights parade where the police protected the protesters, and in fact it was the protesters who were injured, not the members of the parade, and that's in the record at page 148, A.R. 148. That occurred in 2006, which was after the rape. But the other things cited were before? The change of the statute was, yes, homosexuality had been criminalized in Romania, and I believe it was in 2000. But you agree that if there was past persecution, then the changed circumstances would have to be proven by the government affirmatively. We would have the preponderance of the evidence. And there's absolutely no indication that the I.J. did that. Well, the I.J. actually did. He cited the articles that came in. I understand that, but he put the burden on the – I mean, he clearly said that she had not established it. I mean, in other words, the burden was not on the government, the way he did that. I think that's – I understand Your Honor's position. I think that's semantics. He said we have these two articles and – or these articles, and they would – they would show that conditions have changed. We believe that puts the preponderance of the evidence on the government. I am out of time, Your Honor.  Thank you very much. Thank you for your argument. Thank you, Your Honor. I guess the one thing I wanted to say to the government is, I mean, if you change your mind about the way you want to defend a case, and I understand that you switch who argues it, it would be nice if you wrote us and told us – gave us an argument that we can work with, because we don't have one. I mean, on this credibility issue. You just left us, the Court, in the lurch in terms of having a government argument on this point. Well, that's – yeah. That's still not an argument. But, okay. Thank you. Go ahead. Your Honor, Respondent's reason for the adverse credibility finding being supported by substantial evidence in this case simply don't hold up. In this Court's case in Moussa v. Mukasey, which is cited in the briefs, it was a very similar set of circumstances. The Petitioner told her brother, but not the asylum office, and didn't tell her attorney. Her brother, in fact, informed her attorney, and the attorney didn't disclose it until Petitioner was ready. And Petitioner spontaneously revealed it at the Immigration Court. And this Court held that that – what we know about sexual assault survivors is that that kind of explanation is reasonable. This Court needs to consider that the Board of Immigration Appeals and the immigration judge didn't even consider whether, in light of a rape victim survival mechanism, whether or not that explanation was reasonable. We don't know why the asylum office referred in this case. The record is totally silent to that. It's not as though we got a referral that said, well, if you had been raped, it would be different, and then all of a sudden she came up with a rape. We don't know why the asylum office referred. What we do know is we have her explanation. She was absolutely consistent on every other point. There's no other inconsistencies. And this case is just like the precedent of this Court, where there's the one inconsistency, the failure to reveal it later. Her family and Stella and all those people, they followed her lead. She didn't reveal it. They were her family and friends. They weren't going to force her out to the government. Okay. Thank you very much. Thank both of you for your arguments. The case of Stecco v. Holder is submitted.
judges: Smith, Fernandez, Berzon